340

Coca Cola Bottling Co. of Puerto Rico, Inc., demandante y recurrente, *v.* Fernando Sierra Berdecía, Secretario del Trabajo de Puerto Rico, etc., demandados y recurridos; Mariano Rodríguez y Otros, y Narciso Vázquez Díaz y Otros, interventores.

*Número:* R-62-199      *Resuelto:* 10 de mayo de 1963

*Beverley, Castro & Rodríguez Lebrón,* abogados del recurrente; *Manuel Janer Mendía* y *Carlos Bastián Ramos,* abogados de los recurridos; *Francisco Aponte Pérez,* abogado de los interventores.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

La recurrente, Coca Cola Bottling Co. of Puerto Rico, Inc., radicó ante el Tribunal Superior de Puerto Rico, Sala de San Juan, una solicitud de sentencia declaratoria alegando que existe una controversia entre las partes en este caso, con respecto al decreto mandatorio de la Junta de Salario Mínimo aplicable a las operaciones de la recurrente realizadas a través de sus establecimientos localizados en distintos puntos del Estado Libre. Sostiene la recurrente que los decretos aplicables a sus operaciones, tanto en su fábrica y oficina principal situada en el sector de Hato Rey en San Juan, Puerto Rico, como en sus establecimientos en distintos lugares del Estado son los Decretos Mandatorios Núm. 33 aplicable a la industria de alimentos y productos relacionados (29 R.&R.P.R. secs. 245n–551 a 553) en lo que respecta al salario mínimo aplicable y el Núm. 5 de dicha Junta (29 R.&R.P.R., secs. 245n–71 a 75) en cuanto a las demás condiciones de trabajo. Los recurridos y los interventores, por el contrario sostienen que las operaciones de los establecimientos de la recurrente establecidos en distintos lugares del Estado Libre están cubiertos por el Decreto Mandatorio Núm. 34 que define y cubre la industria de comercio al por mayor y almacenaje para el comercio local (29 R.&R.P.R., secs. 245n–561 a 563) en lo que respecta a salario mínimo, y por el Decreto Mandatorio Núm. 16 (29 R.&R.P.R. secs. 245n–271 a 278) que rige el comercio al por mayor, en cuanto a las demás condiciones de empleo.[1].

---

[1] Las disposiciones pertinentes de los referidos decretos son las siguientes:

No existe contienda en cuanto a los hechos ya que fueron estipulados por las partes. Un breve resumen de los mismos es el siguiente:

La recurrente se dedica a la manufactura de bebidas refrescantes y gaseosas y a esos efectos tiene su planta industrial en San Juan, Puerto Rico. Vende y distribuye el producto de su manufactura en dos formas, a saber: 1) a través de una flota de camiones—cada uno de estos camiones es manejado por un conductor vendedor; salen todos los días de dicha fábrica y se dirigen por distintas rutas a la zona metropolitana de San Juan y a otros pueblos del Este de Puerto Rico. Su propósito es vender el producto al comercio detallista y mayorista. Dicho conductor vendedor no tan sólo sirve órdenes previamente colocadas con la recurrente, sino que gestiona otras ventas del producto, cobra el importe de las ventas o hace facturas, con la colaboración de su ayudante

---

DECRETO MANDATORIO NÚM. 33 (sec. 245n–551)

"(a) Este decreto mandatorio es aplicable a todos los empleados de la 'industria de alimentos y productos relacionados', según ésta se define a continuación:

(1) 'La industria de alimentos y productos relacionados' comprenderá el enlatado, conservación . . . o cualquiera otra manufactura o elaboración y el empaque cuando se hace conjuntamente con dichos procesos, de . . . . *bebidas refrescantes*, . . . [Énfasis nuestro.]

.     .     .     .     .     .     .     .     .

"(b) Las distintas clasificaciones de dicha industria tendrán el significado que a continuación se dispone:

.     .     .     .     .     .     .     .     .

(9) *'Gaseosas y bebidas refrescantes' comprenderá todas las operaciones necesarias o relacionadas con la manufactura de toda clase de bebidas refrescantes incluyendo las bebidas gaseosas*". (Énfasis nuestro.)

En nota sobre el referido decreto, la Junta de Salario Mínimo hace constar que a los empleados dedicados a la manufactura de gaseosas y bebidas refrescantes le son de aplicación las condiciones de trabajo que figuran en el mencionado Decreto Mandatorio Núm. 5.

DECRETO MANDATORIO NÚM. 5 (sec. 245n–75)

".     .     .     .     .     .     .     .     .

(d) *Definición de la industria.* La industria de . . . gaseosas a la cual se aplica este decreto se define como sigue: La industria de . . . gaseosas . . . comprende, sin que ello se entienda como una limitación, todos los

descarga el producto vendido, y carga las botellas de cajas vacías y se las acredita al cliente. Tan pronto se le agotan las existencias en el camión, regresa a la planta, carga de nuevo y repite esta operación día tras día; 2) tanto en el propio predio de su fábrica como en Ponce, Mayagüez, Aguadilla y Arecibo, la recurrente ha establecido unos depósitos o almacenes de parte de la producción de su referida fábrica. Otra flota de camiones, mantiene estos almacenes abastecidos de la producción de la recurrente, y recoge de ellos las botellas vacías y cajas que entrega la clientela. De estos almacenes salen diariamente otros camiones cargados del producto elaborado por la recurrente para ser vendidos en la misma forma que se hace bajo el procedimiento de distribución y venta primeramente descrito.

*"Solamente cuando el cliente se ha quedado corto de gaseosas y el camión asignado a la ruta habrá de tardar en volver a hacer el recorrido por dicha ruta, es que los detallistas y mayoristas*

actos, procesos, operaciones y servicios que sean necesarios, incidentales o relacionados con la preparación, producción, distribución o disposición por el fabricante . . . de cualquier . . . bebida refrescante que se prepare a base de agua carbonatada."

DECRETO MANDATORIO NÚM. 34 (sec. 245n–561)

"Este decreto mandatorio es aplicable a todos los empleados de la 'industria de comercio al por mayor y almacenaje para el comercio local', según ésta se define a continuación:

(1) La 'industria de comercio al por mayor y almacenaje para el comercio local' comprenderá . . . sucursales y oficinas de ventas de firmas manufactureras establecidas para la distribución al por mayor de sus productos . . .

. . . . . . . .

(3) Sin embargo, la definición no incluye:

. . . . . . . .

(B) *Las actividades de aquellos empleados que se dediquen a ventas industriales al por mayor y almacenaje de productos manufacturados por su patrono en Puerto Rico, . . .*" (Énfasis nuestro.)

En nota con respecto a este decreto, informa la mencionada Junta que por razón de lo dispuesto en la sec. 40(b) de la Ley de Salario Mínimo de Puerto Rico (29 L.P.R.A. sec. 246(k)), son aplicables a esta industria las disposiciones del Decreto Mandatorio Núm. 16 sobre períodos máximos de labor y condiciones de trabajo.

*llaman o acuden al almacén o depósito o establecimiento para suplirse directamente de éste. Ocasionalmente se vende el producto en el almacén o depósito o establecimiento al público consumidor, pero en tal caso no se vende menos de una caja y se le carga el mismo precio que le cargaría al público consumidor el detallista o mayorista. La compañía tiende a desalentar así las ventas directas al consumidor . . ."* (Énfasis nuestro.)

El 98% del producto es vendido al cliente directamente y sólo el 2% es vendido por y desde el propio almacén. El personal de cada uno de estos almacenes consiste de un empleado de oficina, los vendedores, conductores de camiones, sus ayudantes, empleados de carga y descarga, conserje y mecánico de refrigeración. La planta central lleva un récord de los productos entregados a cada almacén y diariamente el oficinista de cada almacén rinde a la fábrica de la recurrente un informe de las ventas efectuadas, remite un cheque de gerente por el dinero recaudado por la vendedora y envía los récords de las ventas, lo que sirve de base a la fábrica para hacer la facturación al cliente. Por último, dicho empleado también informa diariamente a la fábrica un informe del número de horas trabajadas y la comisión devengada por el personal adscrito al almacén. En la oficina central de la fábrica se prepara semanalmente la nómina oficial y la misma se remite a cada almacén acompañada del dinero necesario para pagar al personal. La supervisión y administración, las pautas, normas y reglas de la operación de estos almacenes es responsabilidad de la oficina central de la fábrica, la cual contrata, despide y disciplina todo el personal de los referidos almacenes. Dirige también las relaciones obrero-patronales de los almacenes, las que se regulan por convenios colectivos que negocia y administra la oficina central.

La operación manufacturera de la recurrente, como es natural e inherente a todo negocio fabril, no sólo consiste en la operación de manufactura, sino que necesariamente incluye la distribución y venta industrial del producto elaborado. Es obvio, pues, que los almacenes en cuestión no son

otra cosa que una parte esencial del negocio de manufactura y no una operación separada y distinta del mismo aunque de hecho algunos de los almacenes estén físicamente situados fuera del predio de la fábrica de la recurrente. Por lo tanto, a menos que los decretos mandatorios no dispongan clara y expresamente otra cosa, los empleados de los almacenes en cuestión deben estar sujetos a las mismas condiciones de empleo y salario que los otros empleados del negocio de la recurrente.

Esta norma de interpretación se ajusta a lo dispuesto por la Asamblea Legislativa de Puerto Rico en la declaración de principios de la Ley de Salario Mínimo (29 L.P.R.A. secs. 245), al efecto de que es política del Estado Libre Asociado *"el acelerar el desarrollo de la agricultura, la industria y los negocios en Puerto Rico . . . y lograr el más alto nivel posible de jornales consistente con dicho desarrollo sin reducir sustancialmente el empleo ni menoscabar la oportunidad de obtener mejores salarios."* (Énfasis nuestro.) En la Sec. 15 de dicha Ley (29 L.P.R.A. sec. 245n) se dispuso que *al fijarse los salarios para cada industria se tendrán en cuenta los anteriores propósitos y que tales salarios deberán ser los más altos que razonablemente pueda pagar la industria sin reducir sustancialmente el empleo y tomando en consideración el coste de vida y las necesidades de los empleados, así como las condiciones económicas y de competencia de la industria en cuestión.* Al fijar la referida política, indudablemente se tuvieron en consideración ciertas realidades económicas prevalecientes en Puerto Rico tales como, su alto desempleo endémico,[2] su

(2) "Durante los últimos doce años (1950 a 1962) se han creado unos 140 mil empleos en actividades altamente productivas como son la manufactura, la construcción, servicios gubernamentales, etc. Pero a la vez se ha visto la desaparición de unos 150 mil empleos en la agricultura, el servicio doméstico, la aguja a domicilio y otros trabajos de una baja productividad. Por ende, mientras la producción bruta de la economía se ha multiplicado, el número de empleos se ha mantenido estable a través de estos años.

"Como resultado, el índice de desempleo no ha registrado mejoría notable. En el mes de abril—mes de máxima actividad económica en el

creciente problema poblacional, (³) otras condiciones de la situación local (⁴) y la competencia que ofrecen otras áreas de

---

país, por razón de la zafra—de 1940, un 11% de la fuerza obrera puertorriqueña estaba desocupada; hace unos diez años, hubo un 11.3%; en abril de 1962 fue de un 9.3%. El promedio anual en el 1962 fue de un 12.3%; durante el transcurso del año un promedio de 84,000 puertorriqueños se encontraban desocupados, deseando ellos la oportunidad de trabajar.

"Las perspectivas para una mejoría en la tasa de desempleo no resultan ser muy alentadoras. Las perspectivas son de que crezca la población súbitamente como resultado de la reducción en la migración, significando que habrá muchos más brazos para ocuparse durante el transcurso de los años.

"Las proyecciones son de que el grupo trabajador ascenderá a 810,000 en el 1970, a 925,300 en el 1975. (En el 1962 fue de unos 675,000). No obstante, el nivel de empleo anticipado para estas fechas son 709,000 y 823,000 respectivamente, los cuales implican un aumento de 124,000, y 238,000 sobre el nivel de ocupación en el 1962. Es decir en los próximos 13 años será necesario crear empleos a un ritmo de unos 18,000 anualmente, lo que compara con la reducción neta que se ha observado durante la última década. Y no obstante al final del período habrán más de 100,000 puertorriqueños desocupados, los cuales representarán el 11% de la fuerza obrera." Fuente de Información—Oficina de Estudios Económicos, Administración de Fomento Económico.

(³) "Proyecciones del crecimiento poblacional y empleos:

| | 1960 | 1965 | 1970 | 1975 |
|---|---|---|---|---|
| Población (miles) | 2,350 | 2,612 | 2,897 | 3,218 |
| Empleos (miles) | 542 | 625 | 709 | 823 |
| No-agrícola (miles) | 417 | 513 | 614 | 742 |
| En fábricas de Fomento (miles) | 44 | 73 | 110 | 160 |
| Programa acelerado de Fomento (miles) | | 80 | 121 | 176 |

Esta última cifra significa que para 1975 deberán establecerse en Puerto Rico unas 2,830 fábricas."
Fuente de Información: Proyecciones oficiales de población elaboradas por el Departamento de Salud y la Escuela de Medicina, adoptadas por la Junta de Planificación e incorporadas en carta circular del presidente que se enviara al Administrador de Fomento Económico el 1ro. de junio de 1962. Cifra para el 1960 es del Censo de Población.

Proyecciones de empleo son de una tabulación de la Junta de Planificación, titulada 'Empleo por Sectores Económicos e Industriales, Serie Histórica y Proyecciones'.

Nuevas metas de empleo en fábricas de Fomento, 1965 y 1970, Administración de Fomento Económico, 'Logros y Perspectivas de los Programas de Fomento, página 6. Cifra para el 1975 provista por la OEE, AFE'.

(⁴) De acuerdo con información publicada por la Oficina de Estudios Económicos de la Administración de Fomento Económico de Puerto Rico,

escaso desarrollo por lograr que una parte sustancial de la expansión industrial norteamericana y europea se lleve a cabo dentro de sus límites territoriales. ([5])

La Junta de Salario Mínimo de Puerto Rico, al redactar y promulgar su Decreto Mandatorio Núm. 24 (29 R.&R.P.R. sec. 245n–441 a 450) sobre la industria de cerveza, anteriormente regida por el Decreto Mandatorio Núm. 5 conjuntamente con la de gaseosas, aclaró la cuestión en discusión, en cuanto a la industria de cerveza, al disponer que dicho Decreto Mandatorio Núm. 24 cubre no tan sólo las operaciones realizadas por el fabricante en el mismo local de la empresa industrial, sino también las que realice en locales o establecimientos subsidiarios. En este decreto se incluyeron las actividades de distribución, propaganda, disposición o venta por el

---

prevalecen ciertas condiciones en el Estado Libre, algunas de las cuales se relacionan a continuación, que no facilitan su desarrollo económico:

1.—La separación geográfica del continente, lo que requiere inventarios altos y ocasiona mayores gastos de comunicación.

2.—Dependencia casi exclusiva de un solo medio de importar materias primas y exportar productos elaborados, o sea, la vía marítima, que en el pasado ha estado sujeto a interrupciones por huelga.

3.—El sistema de revisión periódico de los salarios mínimos por comités industriales, lo que introduce un gran elemento de incertidumbre sobre los futuros costos de operaciones.

4.—Falta del "saber hacer" (know how) indispensable.

*Nota Adicional:* Puerto Rico ha venido gozando de dos ventajas económicas que han hecho posible su desarrollo industrial hasta ahora que son la exención contributiva que permite al empresario retener sus ganancias *siempre y cuando pueda operar con beneficios* y que en muchos tipos de manufactura los costos en Puerto Rico han sido más bajos que en otras áreas debido a la abundancia, facilidad de entrenamiento y productividad de nuestros trabajadores.

([5]) "Ventajas que ofrecen los estados del sur de Estados Unidos:

1.—Recursos naturales: accesibilidad a materia prima, combustible a bajo costo, etc.

2.—Cercanía y accesibilidad a mercados tanto de consumidores finales, como mercados industriales y de exportación.

3.—Medios alternos de transportación de bajo costo que ofrecen un servicio altamente satisfactorio.

4.—100% de financiamiento de la planta física (incluyendo maquinaria y equipo).

5.—Cánones de arrendamiento mucho más atractivos que en Puerto Rico."

fabricante como parte de la industria de cerveza. No hay duda sobre la conveniencia y efectividad de una reglamentación que claramente defina su alcance no tan sólo en cuanto a las distintas fases del negocio sino también en cuanto a la forma y manera de llevar a cabo las funciones de cada una de las distintas operaciones o actividades de la industria. Ese mismo grado de claridad en la redacción no existe con respecto a la industria de alimentos y productos relacionados (que incluye las gaseosas) que es precisamente el tipo de industria que más se ha prestado para ser desarrollada por empresarios del país toda vez que gran parte de la materia prima es de fuente local y su principal mercado ha sido el del país. Por otra parte, es el tipo de industria más sujeto a una fuerte competencia, a veces desleal, como ocurre en los casos en que productores de fuera del país venden sus productos en Puerto Rico a precios más bajos que en otros mercados.

El tribunal de instancia resolvió que los referidos almacenes de la recurrente son "sucursales de venta de la empresa fabril", según este término se define en el Decreto Mandatorio Núm. 16, pues son establecimientos subsidiarios de la empresa, establecidos en locales distintos de aquél que es ocupado por la empresa fabril y que están destinados a vender y distribuir al por mayor los productos de dicha empresa. Esta conclusión se basa en que fue la intención de la Junta de Salario Mínimo incorporar y trasladar al Decreto Mandatorio Núm. 34 la referida definición contenida en el Decreto Mandatorio Núm. 16.

Apunta la recurrente como error incurrido por el tribunal sentenciador, el declarar aplicables los Decretos Mandatorios Núms. 34 y 16 a las operaciones de la recurrente en sus establecimientos a través de la Isla.

A fin de resolver la cuestión, debemos determinar en primer lugar cuál es la definición de la industria de la recurrente en los decretos mandatorios correspondientes, cuál es el alcance de la misma, y cómo la afectan, modifican o restringen

los decretos que rigen el negocio de comercio al por mayor. La definición inicial de la industria de gaseosas la redacta e incluye la Junta de Salario Mínimo en su Decreto Mandatorio Núm. 5 de 1944. Esta definición claramente incluye las operaciones de distribución o disposición del producto, es decir, las ventas del mismo sin limitación alguna en cuanto a la forma y manera de llevar a cabo esta actividad (escolio 1 de esta opinión). En 1949 la referida Junta promulga el Decreto Mandatorio Núm. 16 sobre el negocio de comercio al por mayor y en la definición de este negocio incluye las "sucursales de venta de empresas fabriles" definida ésta como "un establecimiento subsidiario de una empresa fabril localizado en local distinto al de ésta y destinado para vender o distribuir al por mayor los productos de dicha empresa fabril." En su "Determinación de Hechos, Opinión y Decreto", dicha Junta indicó que en esta definición no están incluidos los procesos que lleve a cabo una persona o entidad agrícola o fabril hasta el punto en que entregue su producto al comerciante o entidad que habrá de vender el mismo y por consiguiente la definición no abarca las empresas fabriles sino las sucursales de ventas de éstas. En el decreto mandatorio en cuestión se definen tales sucursales como: 1) establecimientos subsidiarios de una empresa fabril; 2) en local distinto del de ésta; y 3) destinado a vender o distribuir al por mayor los productos de dicha empresa.

La Ley de Salario Mínimo de Puerto Rico, vigente desde 1956, definió la industria de mayoristas, almacenistas y otros distribuidores y fijó el salario mínimo para distintas divisiones de ésta así como para el caso de que el trabajo estuviere cubierto por la Ley de Normas Razonables del Trabajo, y además dispuso que la Junta revise los salarios mínimos, incluyendo en el aviso correspondiente la definición que la Junta crea más adecuada para la industria en cuestión (29 L.P.R.A. secs. 246i (J), 245e (b) IV y (d) IV, 245j y 245p).

■ En 30 de octubre de 1957 la Junta aprobó el Decreto Mandatorio Núm. 33 en el que redefinió la referida industria de alimentos y productos relacionados (véase escolio 1, *supra*) y fijó un salario de 55¢ por hora para los trabajadores de dicha industria. No abrigamos duda que la definición de la industria de gaseosas y bebidas refrescantes contenida en este decreto necesariamente incluye las actividades de almacenaje, distribución y venta del producto, pues éstas son operaciones necesarias a y relacionadas con la manufactura. Sabido es que toda operación manufacturera consiste de dos funciones principales y básicas que son la producción de un artículo de comercio y su almacenaje, distribución y venta. Por último, en la fecha antes indicada también aprobó la Junta su Decreto Mandatorio Núm. 34 (enmendado en 1959) que redefinió la industria de comercio al por mayor y dispuso al efecto que dicha industria comprende las "sucursales y oficinas de ventas de firmas manufactureras establecidas para la distribución al por mayor de sus productos." Pero la definición de la referida industria en dicho decreto *excluye* "las actividades de aquellos empleados que se dediquen a ventas industriales al *por mayor y almacenaje de productos manufacturados por su patrono en Puerto Rico.*" Es evidente y así se consigna en el estudio económico de la propia Junta referente al referido Decreto Mandatorio Núm. 34, que el alcance de esta modificación es extender la aplicación de la definición de comercio al por mayor con el fin de cubrir no tan sólo las sucursales u oficinas de venta de fabricantes de productos elaborados fuera de Puerto Rico sino también las de los fabricantes del país. Sin embargo, se indica en dicho informe que la definición no incluye "el almacenaje ni la distribución y entrega del producto por el manufacturero en sus almacenes o depósitos privados situados en las inmediaciones (*premises*) de la planta o fuera de sus inmediaciones, a menos que otras operaciones en dichos almacenes den base para considerar que se están *realizando en ellos ventas al por mayor o al detal y*

*en este caso las primeras quedarían cubiertas por la defini-*
*ción y las segundas (las ventas al por menor) por el decreto*
*mandatorio núm. 8 (enmendado) de la Junta de Salario*
*Mínimo."* (Énfasis nuestro.)

El nervio de la cuestión en este caso consiste en deter-
minar cuál es la distinción exacta entre una "sucursal u ofi-
cina de venta de firma manufacturera" y "las actividades
de aquellos empleados que se dedican a ventas industriales
al por mayor y almacenaje de productos manufacturados por
sus patronos en Puerto Rico" que según el Decreto Manda-
torio Núm. 34 quedan excluidos de sus disposiciones y, por
lo tanto, sujetos a lo dispuesto en los Decretos Mandatorios
Núms. 33 y 5 con respecto a la industria de gaseosas y bebidas
refrescantes.

■ En *Srio. del Trabajo* v. *Borinquen Pasteurizer*, 83
D.P.R. 546 (1961), tuvimos ocasión de considerar hechos
análogos a los del caso ante nos, excepto que en aquél, 1) el
almacén donde se almacenaban las bebidas gaseosas produci-
das por la recurrida se cerraba tan pronto los vendedores car-
gaban sus camiones con productos de dicho almacén y salían
a venderlo por la mañana, abriéndose el depósito de nuevo
al regresar los camiones por las tardes y 2) no había teléfono
ni recibían órdenes en dicho almacén. Bajo tales circunstan-
cias concluimos que el almacén en cuestión constituía un sitio
de almacenar refrescos embotellados en el cual los mismos
ni se vendían ni se distribuían y, por lo tanto, dicha opera-
ción no se regía por el decreto mandatorio que cubre al comer-
cio al por mayor. Hicimos referencia entonces al memorán-
dum interpretativo emitido por el Departamento del Trabajo
en 14 de septiembre de 1950 (Núm. 8 del Decreto Núm. 16)
en que se informa que la manera más fácil de distinguir entre
las ventas que hace un industrial a mayoristas y detallistas,
denominadas "ventas industriales", las que no están cubier-
tas por el decreto que rige al comercio al por mayor, y las que
pueda realizar el industrial como comerciante en un estable-

cimiento subsidiario, denominadas "ventas comerciales", que sí están regidas por tal decreto, consiste en determinar si las mismas se hacen o no en un establecimiento comercial. Se entiende por establecimiento comercial, un local destinado a la venta y distribución de artículos: un establecimiento que usual o *diariamente está abierto a clientes y compradores para realizar en el mismo transacciones de compra y venta.* En el caso ante nos los almacenes en cuestión permanecen abiertos de manera que los detallistas y mayoristas pueden acudir o llamar al almacén para suplirse en casos de necesidad inesperada y aislada y ocasionalmente se vende en el almacén al público consumidor. Pero el resultado es que sólo el 2% de las ventas totales de los almacenes se hace por y desde el mismo almacén. El encargado de cada uno de los almacenes en este caso permanece todo el día en él junto con el conserje, el mecánico de refrigeración y trabajadores de carga y descarga. Esta situación y la proporción de ventas indicadas no demuestra que la recurrente tuviese el propósito de establecer y operar, y de hecho operase, un establecimiento comercial en donde usual o diariamente se hiciesen transacciones de ventas. Más bien, es evidente que se trataba de depósitos o almacenes establecidos por la recurrente como medio o instrumento de llevar a cabo sus ventas industriales a clientes mayoristas y detallistas. Las ventas mínimas realizadas directamente desde los almacenes tenían como propósito solventar necesidades inesperadas y aisladas de la clientela ya que a ésta le tiene que ser más cómodo y económico el *comprar de los camiones que salen de los almacenes que acudir a los almacenes directamente para realizar allí sus compras.* Indudablemente, por esta misma razón, la recurrente no ha constituido sus almacenes en los establecimientos de ventas comerciales que la Junta de Salario Mínimo tenía en mente al modificar en su Decreto Mandatorio Núm. 34 la definición de la industria de comercio al por mayor. Cf. *Santana* v. *Blasco,* 78 D.P.R. 655 (1955). Resolvemos, por lo tanto, que

el establecimiento y operación por la recurrente de sus almacenes en la forma y manera estipulada tenían como propósito el llevar a cabo una parte esencial de su negocio de manufactura que es la distribución y entrega a su clientela del producto elaborado por ella por medio de "ventas industriales", constituyendo tales almacenes parte integral necesaria y esencial del negocio fabril de la recurrente. A nuestro juicio, de acuerdo con la estipulación de hechos, la recurrente no llegó a constituir sus almacenes en establecimientos comerciales bajo el patrón usual y corriente en el comercio 1) de inducir y gestionar que la clientela recurra al establecimiento a hacer sus compras y a colocar sus órdenes y en general a realizar negocios con la recurrente y 2) de promover y gestionar libremente y sin restricciones la realización de ventas directamente al público desde dichos establecimientos. Esta conclusión no está en conflicto con el juicio que expresamos en *Sierra* v. *San Miguel Fertilizer Corp.*, 73 D.P.R. 341 (1952), pues en este caso los hechos estipulados demostraban que el establecimiento en cuestión fue constituido por dos distintos fabricantes en forma de una sucursal para de allí vender sus distintos productos directamente a agricultores para uso en sus respectivos fundos y no para ser objeto de reventa. La cuestión a determinar en ese caso era si el trabajo efectuado en dicha sucursal estaba cubierto por el Decreto Mandatorio Núm. 8 que rige el negocio de ventas al por menor o, como alegaba el querellante si dicho trabajo estaba cubierto por el Decreto Mandatorio Núm. 16 que cubre el negocio de comercio al por mayor. Resolvimos que el Decreto Mandatorio Núm. 8 era el aplicable. En ningún momento se alegó o estuvo en discusión ni se estipuló sobre el hecho de que los patronos estuviesen realizando ventas industriales desde la referida sucursal. En *Sierra, Comisionado* v. *Llamas*, 73 D.P.R. 908 (1952), dictaminamos que los trabajadores de una fábrica de hielo que se dedican a la venta del producto a los consumidores directamente están cubiertos por el Decreto Mandatorio Núm.

8 que rige el negocio de ventas al por menor. En este caso tales ventas no se hacían de un establecimiento comercial separado y distinto de la fábrica, sino directamente de ésta. Indicamos en esa ocasión, y en ello estriba la distinción fundamental entre dicho caso y el que nos ocupa, que:

"El apartado A, inciso 1, del Decreto núm. 8 incluye ventas al por menor consumadas en algún establecimiento o en sitio cualquiera destinado total o parcialmente a esos fines. No solamente estaría justificado el decir que la fábrica del demandado se dedica parcialmente a la venta de hielo a los consumidores, sino que la realidad es que el propósito esencial de esa fábrica es vender hielo a los consumidores. La fábrica no tendría significación sin esas ventas al por menor. El apartado A, inciso 1, no excluye a trabajadores que se dediquen a ventas al por menor por el hecho de que los artículos así vendidos se originen en la fábrica de su patrono. Esa disposición es amplia y comprensiva, y el juzgador no debe suplir una exclusión donde no la hay en el Decreto, especialmente si el Decreto incluye a todos los trabajadores que se dediquen a ventas al por menor. Por esas razones es que dicho apartado A, inciso 1, es de aplicación a los trabajadores envueltos en este caso."

■ *Por las razones indicadas se revoca la sentencia y se dictamina que los trabajadores de la recurrente que realizan sus labores en o desde los almacenes que aquélla ha establecido y opera en relación con las ventas industriales de producto elaborado por ella están cubiertos por los Decretos Mandatorios Núms. 33 y 5 y no por los Decretos Mandatorios Núms. 34 y 16 de la Junta de Salario Mínimo de Puerto Rico.*